**AVCO CORPORATION, Plaintiff,**

v.

**AMERICAN TELEPHONE AND TELE-GRAPH COMPANY, Defendant.**

Civ. A. No. 7275.

United States District Court,
S. D. Ohio, W. D.

July 17, 1975.

Thomas Y. Allman, Taft, Stettinius & Hollister, Cincinnati, Ohio, for plaintiff.

James G. Headley, Frost & Jacobs, Cincinnati, Ohio, for defendant.

## OPINION

DAVID S. PORTER, District Judge.

With the consent of the parties, this cause was referred to United States Magistrate Burton Perlman to sit as a special master in accordance with the provisions of Rule 53 of the Federal Rules of Civil Procedure. After the Report of the Master (doc. 65) was filed on December 5, 1974, both parties moved that this Court take action upon the report and upon certain objections thereto.

Before examining the specific objections raised by the parties, we think it appropriate to review briefly the background of this case. The controversy arises out of a contract (Joint Exhibit 51) which the parties entered into on April 24, 1967. We note that it is part of defendant's business to maintain a

network of microwave relay stations spanning the nation, and we note that such network plays a crucial role in the nation's television and telephone systems. Each of the microwave relay stations referred to above includes antennas for receiving and transmitting microwave signals, which antennas are ordinarily mounted on a tower. As stated by the special master, this litigation is concerned with "a process known as 'path-loss testing,' the end result of which is to produce the information necessary to form a judgment as to acceptable relay station placement and tower height" (doc. 65, p. 2). More specifically, this litigation involves a novel approach to path-loss testing whereby the parties envisioned procuring the necessary relay placement information by means of specially equipped helicopters rather than by means of conventional temporary towers.

During pre-trial discovery it became apparent that a protracted trial would be necessary due to the factual complexity of the case, and it became increasingly apparent that the trial would involve exceptionally technical matters. In short, it became apparent that the case was particularly well-suited for reference to a special master. Not surprisingly, both parties agreed that Magistrate Perlman, with his technical background and prior experience with specialized cases, was the logical choice, and the case was formally referred to him on April 25, 1973.

Thereafter, discovery was completed and the special master conducted a seven day trial which concluded on February 19, 1974. Fifteen live witnesses yielded approximately 1,200 pages of trial transcript, and depositions accounted for another 600 pages of transcript. Moreover, there were roughly 200 exhibits of various kinds and extensive briefs from both sides. Finally, the parties were summoned for further arguments before the special master on August 2, 1974, and both sides filed additional submissions on that occasion. The master

filed his report on December 5, 1974, recommending that plaintiff have judgment in the amount of $128,000 and costs. Such recommendation was grounded upon the master's finding and/or conclusion that plaintiff had rendered part performance in accordance with the terms of the contract and was excused from rendering full performance by virtue of a modification agreement entered into by the parties on January 26, 1968 (doc. 65, p. 17).

Viewed in its entirety, there can be no question that the Report of the Master shows a conscientious consideration of the case. The report includes a thorough analysis of technical facts as well as a scholarly treatment of the legal theories and contentions of both parties. This does not mean, of course, that this particular report is to be accorded any special treatment. Rule 53(e)(2) of the Federal Rules of Civil Procedure indicates that careful consideration is to be given master's reports, and specifically provides that "[t]he court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions." A master's findings of fact are to be accepted unless clearly erroneous, and we exercise our independent judgment as to conclusions of law. With these standards and the above background in mind, we turn to the specific objections raised by the parties herein.

In applying to this Court for action upon the master's report, defendant AT&T (also referred to as the Telephone Company, or Telco) raised the following objections (doc. 72):

"1. The finding that the parties entered into a contract on January 26, 1968 modifying the original contract of April 24, 1967 . . . is contrary to the evidence, is not supported by any evidence and is contrary to law.

\*     \*     \*     \*     \*     \*

2. . . . the Special Master's finding that plaintiff rendered part

performance under the contract in accordance with the terms of the contract . . . is contrary to the evidence and is based on a misapprehension of the evidence.

\* \* \* \* \* \*

3. . . . the Master's finding that plaintiff is entitled to recover the contract price less the cost to defendant of completing the work left undone at the time of termination . . . is contrary to the evidence, is based on a misapprehension of the evidence and is contrary to law.

\* \* \* \* \* \* .

4. The recommended award of $128,000 to plaintiff is without support in law and the authorities cited by the Special Master are inapposite."

While the defendant thus raised and briefed four objections, only the first objection (pertaining to modification) was strenuously urged at oral argument before this Court on May 1, 1975. Indeed, defendant's counsel candidly stated at that time that defendant would "stand or fall on that single objection." Whether or not he truly expected to be taken up on that, we find upon consideration of the report, and the record, and the law, that defendant's other three objections are not well taken. Those objections are therefore overruled, and we address ourselves now to the single objection pertaining to the master's finding that the parties entered a modification agreement on January 26, 1968. We observe, however, that this single objection actually poses two questions: 1) whether or not a modification agreement was entered into; and 2) whether the master even had a right to consider that issue in view of the fact that it was not raised by the parties.

■ It is necessary, at this point, to summarize the events leading up to the date of January 26, 1968. The first day of helicopter testing occurred on January 9, 1968. Due to problems with equipment and weather, however, no further testing took place until January 19. On that day Telco engineers noticed large swings in the needle of a particular meter, which swings (in their opinion) indicated that the system was not operating satisfactorily. Testing resumed on January 24, 1968, but again large swings were observed. Testing was discontinued for that day and the parties arranged to hold a meeting in Chicago on January 26, 1968. At that meeting all further testing was discontinued by mutual consent, and it was the master's conclusion that "the project was terminated when the parties entered into a contract on January 26, 1968 modifying the original contract of April 24, 1967" (doc. 65, p. 16). Defendant objects, arguing that there was no modification because Telco's representatives at the Chicago meeting had no authority to modify the original contract; there was no manifestation of assent to any modification agreement; and there was no consideration.

Listing the Chicago participants, defendant states that "[p]resent on behalf of Telco were Mssrs. Scobee, nowhere identified in the record, Bottani, Radio Engineer, mistakenly described by the Special Master as an 'executive', Finney, Supervisor in Transmission Engineering, Drackley, a Telco Field Man, Meehan, Transmission Engineer, McJohnston and Leichsenring, Telco Contract Administrators" (doc. 72, p. 3). Defendant then goes on to say that these representatives were nothing "other than 'meat and potatoes' men basically concerned with the mechanics of path-loss testing in the field" (doc. 72, p. 3).

The record clearly indicates that the above named representatives held positions of considerable importance and responsibility within the Long Lines Department of the Telephone Company. As defendant itself points out (doc. 72, p. 1), "Frank Finney had been supervisor in transmission engineering for Telco for 8½ years and was responsible

for orientation and testing of all antenna systems in the Long Lines Central Area." Finney's immediate supervisor was Bottani who, as a radio engineer certainly did hold "a title of some importance in defendant's heirarchy" (doc. 65, p. 7). Bottani, in turn, reported to Meehan who held the position of transmission engineer (deposition of John P. Meehan, p. 7). As transmission engineer, Meehan was responsible for many things besides path-loss testing and microwave relay systems. Indeed, "the greater proportion of [his] time was involved with coaxial cable and the carrier systems that go with it, switching systems, central offices and a large number of other activities that go into the operation of our entire system" (Meehan deposition, p. 14). And J. D. Scobee (whom defendant mistakenly claims was nowhere identified in the record) was staff radio engineer at Long Lines Department national headquarters in New York. Scobee attended the Chicago meeting "because he represented Long Lines headquarters . . . who really made the original agreement to test" (Meehan deposition, p. 50). Finally we note the presence of the men who actually prepared the bulk of the contract in question, Mssrs. McJohnston and Leichsenring. Mr. McJohnston stated that he attended the meeting because he was responsible for the contract administration (McJohnston deposition, p. 19), and Mr. Meehan indicated (by way of a memorandum introduced into evidence as Joint Exhibit 102) that McJohnston and Leichsenring were in attendance "[p]art time for contract discussion."

We cannot agree that the above individuals were just "meat and potatoes" men concerned with path-loss testing in the field. It is our opinion that they were fully apprised of the situation and that they had real and/or ostensible authority to modify the contract. We think this view is further supported by the fact that the very purpose of the meeting, altho expressed in slightly different words by different people, was to review the entire status of the operation and reach a decision as to what should be done (Meehan deposition, p. 48; McJohnston deposition, pp. 19-21).

Defendant argues next that there was no manifestation of assent to any modification agreement. Again, we disagree. Defendant admits (doc. 72, p. 2) that evidence of what transpired at the Chicago meeting is reflected in Joint Exhibit 102 (JE 102), entitled "Highlights of Meeting—Long Lines and Avco, Chicago, January 26, 1968," written by Mr. Meehan shortly after the meeting took place. In that memorandum Meehan described the result of the meeting as follows: "Agree to discontinue trial by mutual consent and work out contract settlement later." Meehan testified that the memorandum accurately reflects what the parties said at the meeting (Meehan deposition, p. 51); and both Mr. Chandler and Mr. Schulz (two of Avco's representatives who were present at the meeting) agreed that the memorandum was an accurate description of what had taken place (Trial transcript, p. 110 and pp. 554-55, respectively). Bottani testified that it was mutually agreed to cease operations (Tr. 654) and he too agreed that JE 102 was an accurate reflection of the Chicago meeting (Tr. 655). Telco's Drackley, in describing the Chicago meeting of January 26, 1968, stated that "It was mutually agreed at this time to discontinue the helicopter path testing project" (Drackley deposition, p. 122). Frank Finney authored a report, dated February 29, 1968 (identified, for record purposes, both as Meehan deposition Exh. 2 and as JE 148), wherein he stated that, at the Chicago meeting, "it was agreed that we would mutually withdraw from the program and determine the terms of settlement later" (p. 6). Finally, although Telco's Carey (who was Meehan's immediate superior) was not present at the meeting, he testified that

it was his understanding that the parties had made a "mutual agreement to quit" (Carey deposition, p. 19) and that "we all agreed to cease and desist back in about February" (Carey deposition, p. 15).

It is our opinion that the celebrated Meehan memorandum (JE 102), coupled with all the other evidence set out above, provides clear and convincing evidence in support of the master's conclusion that defendant modified the contract by agreeing to call a halt to all further testing, thereby excusing full performance on the part of Avco.

This brings us to defendant's argument that there was no consideration for any such contract of modification. Defendant maintains that it derived no benefit of any kind from the "agreement" of January 26, 1968. Yet the master points out (doc. 65, p. 16) that both parties were incurring operational expenses maintaining personnel in the fields, and that both parties withdrew their personnel following the Chicago meeting. Thus the master concluded that "there was consideration in that both parties were relieved of incurring further expenses in performing under the original contract" (doc. 65, p. 16).

Defendant apparently attempts to discount that conclusion by arguing that it had done nothing to prevent Avco from continuing the tests and that "it was Avco that wanted relief" (doc. 72, p. 3). We find this argument unpersuasive because it in no way alters the fact pointed out by the master—i. e., that defendant was relieved of incurring further expenses under the contract. As an aside, we further note that defendant was very anxious to get the designated paths tested and to begin construction. Thus defendant was not at all desirous of any further delay on account of weather and/or equipment, notwithstanding the recognized possibility that plaintiff might have completed its performance. See, e. g., Carey deposition, pp. 45–47; and Meehan deposition

Exh. 2 (JE 148) at p. 6, where Frank Finney, referring to the January 26, 1968 meeting, declared that "considering the scheduling problems arising from previous delays it was agreed that we would mutually withdraw from the program and determine the terms of settlement later."

For the foregoing reasons, it is our opinion that defendant's objections on the grounds of authority, manifestation of assent, and consideration are not well taken. We turn, then, to the second part of Telco's "modification" objection where defendant contends that the master had no legal right to make the modification issue the basis of his recommendation since it was "not raised by the pleadings nor by the parties" (doc. 72, p. 6).

Rule 15(b) of the Federal Rules of Civil Procedure provides, in part, that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." In this case, there was clearly evidence in the record relating to modification, but that does not *necessarily* mean the issue was tried with the implied consent of the parties since the evidence also related to other issues (e. g., termination) which were raised by the pleadings. See *MBI Motor Company, Inc. v. Lotus/East, Inc.,* 506 F.2d 709 (6th Cir. 1974).

In the *Lotus/East* case, supra, an automobile dealer sued a distributor on a misrepresentation theory. After the trial, the District Court entered a memorandum opinion holding that there was no misrepresentation, but that plaintiff was entitled to judgment on an implied warranty theory. The court deemed the pleadings amended to conform to the evidence and denied defendant's motion to reopen for additional proof. On appeal, defendant argued that implied warranty was not an issue in the case until the District Court handed down its opinion, and asserted that it

would have produced additional evidence had it been aware of the exposure to warranty liability. Declaring that implied consent is not established simply because evidence relating to a particular issue is introduced without objection, the United States Court of Appeals for the Sixth Circuit held (supra at 713):

". . . it was error for the District Court to base its decision on the warranty theory, because Lotus/East thereby was deprived 'of an opportunity to present evidence to counter the new theory . . .' *Jackson v. Crockarell,* 475 F.2d 746, 747 (6th Cir. 1973)."

The case at hand is similar to *Lotus/East* in that the master's recommended judgment was based upon a theory not raised in the pleadings (or pretrial orders), and in that defendant now complains that the parties were never "afforded the opportunity to come forward with evidence" (doc. 72, p. 6) on the issue of modification.[1] There are, however, a number of very significant differences between the instant case and *Lotus/East.*

■ In *Lotus/East,* implied warranty was not an issue until the District Court rendered its opinion. Such is not the case here, for approximately five months after the trial, the special master called upon the parties (by means of a letter dated July 26, 1974; see attachment to doc. 77) for oral argument on the effect of an agreement which the master felt the parties had entered into on January 26, 1968. In that letter, the master stated in part that:

"I do not see how such an agreement can be ignored in deciding this case. Yet I find that neither of you has made any reference to it whatever in your proposed findings of fact or briefing.

It may be that neither of you feels that any attention is to be paid to this evidence. On the other hand, it may be that due to your concentration on other matters you overlooked this evidence.

It is my feeling that one way or another this evidence must be dealt with and for this purpose I am inviting you to present oral arguments before me on Friday, August 2, 1974 at 10:30 A. M. I realize that this is short notice and we will reset the time and date upon request if either of you finds such a setting not feasible. If either of you wishes to change the setting, I wish that you would contact the other to arrive at a mutually convenient time and then touch base with my secretary to see if we are clear. (I expect to be away from August 7 until August 27 on vacation.)

It is thus apparent that the parties were invited to argue the modification issue and, at the time of the argument, counsel for defendant recognized that the master was possibly "prepared to say that . . . the things that were said and the matters that transpired at that January 26 meeting amounted to a new agreement . . . and that therefore Avco should recover on that theory . . . ." (doc. 80, p. 18). But rather than proffering additional evidence or filing a motion to reopen for additional proof (as was done in *Lotus/East*), defendant was content to rely upon *evidence already in the record* in support of its oral arguments that the Chicago representatives had no authority (doc. 80, pp. 20–21), that there was no manifestation of assent (doc. 80, p. 26), and—to the extent it was argued— that there was no consideration (doc. 80, pp. 27–29).[2] Moreover, in direct response to the master's question as to

---

1. Indeed, defendant claims that it had "no inkling" that modification might be dispositive. In support of that claim, defendant points to a pre-trial interrogatory from Avco to Telco asking whether Telco contend-

ed that the parties modified the original contract on January 26, 1968. Defendant answered: No. See doc. 72, p. 4.

2. Some of these same arguments were also raised by means of a written memorandum

whether he could consider the modification issue, defendant's counsel opined that the master was bound not by the pleadings but only by the record (doc. 80, pp. 24–25). Indeed, defendant's counsel indicated that he generally "welcomed" (doc. 80, p. 31) the sort of independent consideration suggested by the master, so long as such consideration stayed within the confines of the record.

It is apparent that Telco (unlike the defendant in *Lotus/East*) had ample opportunity to present evidence to counter the modification theory, but chose instead to rely on what it regarded as an adequately developed record. Thus we think that the modification issue was tried by the implied consent of the parties and—if the pleadings have not already been effectively amended by virtue of certain statements of plaintiff's counsel and/or the special master (see doc. 80)—we hereby deem the pleadings amended to conform to the evidence. In sum, we have carefully considered each and every objection raised by defendant and it is our opinion that none of those objections are well taken.

We turn at last to Avco's motion pursuant to Rule 53(e) of the Federal Rules of Civil Procedure wherein plaintiff moved this Court to adopt the master's report, but objected to the report to the extent that there was no "provision for prejudgment interest from January 26, 1968 to the date of entry of final judgment" (doc. 71, p. 1.)[3]

█ Avco argues that the recommended award of $128,000 was easily ascertainable by a simple formula and thus amounts to a liquidated claim from which interest flows as a matter of right. We disagree. Although Avco cites *Bituminous Casualty Corp. v.*

*Lynn,* 503 F.2d 636 (6th Cir. 1974) as authority, examination of that case reveals that it does not support plaintiff's position. In *Bituminous Casualty* the Court held (supra at 646):

> "When the amount of a claim can be ascertained readily by reference to a formula *in the contract* and none of the facts is in dispute or when the amount of the claim itself is not disputed, the claim is liquidated." (Emphasis added.)

In the instant case, there was no formula in the contract, many facts were in dispute, and the entire claim was disputed. We do not regard this as a liquidated claim, nor do we perceive any special circumstances which justify or warrant an award of prejudgment interest in this case. Plaintiff's objection is therefore not well taken and is hereby overruled.

After hearing and careful consideration, it is our opinion that the various objections to the Report of the Master are without merit. This Court, accordingly, hereby adopts the report as submitted.

## REPORT OF THE MASTER

### APPENDIX

This case was referred to the U. S. Magistrate sitting as a Special Master under Rule 53 of the Federal Rules of Civil Procedure upon the express consent of both parties.

### FACTUAL BACKGROUND

The action is one upon a contract entered into between the parties on April 24, 1967 and concerns certain events which took place in the fall of 1967 and extending through most of January

---

(doc. 64), which Telco filed on August 2, 1974—the day of the hearing before the master. Avco, too, filed a submission (doc. 63) on that day.

3. Avco indicated that, while it felt prejudgment interest issues were within the prov-

ince of the District Court, it simply wished to serve a "written objection to the omission of . . . such prejudgment interest in the Report of the Master should this Court conclude that such issue was properly before the Master" (doc. 71, pp. 2–3).

1968. Defendant, as is well known, is in the communications business, the part of which we are here concerned with being carried out by what is called defendant's Long Lines Division. For organizational purposes, Long Lines breaks down its operations in the continental United States into geographical areas, one of which is the Central Area which includes the states of Illinois and Ohio. We will have occasion also to refer to its Eastern Area which includes certain Eastern seaboard states. The general headquarters of Long Lines are in New York City. The headquarters of the Central Area are in Chicago.

It is part of the business of Long Lines to maintain a network of microwave relay stations which spans the nation, including the Central Area and Eastern Area. Each Microwave relay station includes antennas for receiving microware signals from a preceding station and for transmitting such signals to the next succeeding station, the antennas generally being mounted on a tower. These stations are located at approximately 25-mile intervals. Defendant's microwave relay station network came into being beginning in the 1950's and provides a primary means for transmitting signals for television as well as for telephone communication. It is with the determination of the location as well as the optimal height of tower at a relay station location that this litigation is concerned, and more particularly with a process known as "path-loss testing," the end result of which is to produce the information necessary to form a judgment as to acceptable relay station placement and tower height.

In setting out to locate a relay station, inspection is made of the area involved for availability of land for acquisition upon which towers may be erected. Once two possible sites for successive stations are located, the terrain between them must be inspected to assure that there is no condition in the geography which will prevent good transmission from one station to the next. The intervening terrain also determines the height of the towers to be erected at the chosen locations. The first step in determining tower height, then, is to consult topographic maps and to view the terrain between the proposed stations. Using the information from topographic maps and view of terrain, a path profile between the two stations is drawn. The path profile is a sectional view along the surface of the earth between stations showing, for example, the presence of hills, valleys, trees, bodies of water, flat areas, etc. With this information it is possible tentatively to decide how high the tower at each location should be in order to provide a mounting place for antennas on the towers at each location, one transmitting and one receiving, with what is known as "line of sight" clearance over intervening obstructions. But the steps just related are not sufficient for a final determination of tower height and location, for it may be that the nature of the terrain between towers may have an adverse effect on microwave transmissions which is not apparent from visual inspection alone. The process of path-loss testing then comes into play. It involves the making of test transmissions before permanent towers are erected to detect whether visually undetectable conditions exist which must be taken into account.

Prior to the events with which this litigation is concerned, the sole way of carrying out the test transmission process was to actually erect a temporary tower at successive locations. In temporary tower testing on each temporary tower an antenna is mounted on a track on the tower, with transmitting and receiving antennas at successive stations facing each other. The temporary tower technique continues to be the method by which Long Lines conducts its path-loss testing.

Further describing the temporary tower technique, the strength of signal which will be transmitted during the

test from the transmitting antenna is known. Then, based upon the distance between the two towers and also the frequency of the signal, what is known as a free-space signal strength is calculated, these days by means of a computer. When a test signal transmission is made from the transmitting antenna and a signal of the strength computed is received at the receive antenna mounted at a certain height, it will be apparent that any adverse influences existing on the terrain between towers has been overcome. In order to get this information, the first step is to run antennas up their respective tracks at the transmit and receive stations simultaneously, interrupting the upward movement of the antennas at, say, five foot increments, until the receive signal is of the calculated value, indicating that a free-space condition between antennas at that height exists. This procedure, by the way, of raising antennas simultaneously and incrementally on both towers is known as an "A run." "B" and "C" runs are also made. In making a "B" run the transmitting antenna is set at a fixed height, while the receive antenna is moved incrementally on its track. In a "C" run the process is reversed, and the transmit antenna is moved incrementally on its track and the receive antenna is set at a fixed height. By interpreting the information amassed on A, B and C runs conducted with regard to two successive towers, it is possible to form a judgment as to optimal heights for location of antennas on the two towers, optional in the sense that ground reflections and obstructions will not interfere with the signal transmission between the antennas. Following completion of testing, the temporary towers are dismantled and permanent installations made. An independent contractor which has assisted and continues to assist defendant with its temporary tower test procedures is the J. C. Barnard Company. Barnard furnishes personnel who carry out the construction aspects of the temporary tower test procedures,

though the actual signal testing is carried out by defendant's own personnel. That is, defendant's personnel man the facilities for transmitting and receiving signals and carry out the evaluation of the factual information thus assembled.

In 1966 there came to plaintiff Avco's attention a novel approach to the process of path-loss testing in which it became interested because of the possibility that it could develop into a substantial source of business for it. The novel approach contemplated the substitution of helicopters on a tether for temporary towers in path-loss testing. The idea was attractive not only because the actual physical labor of erecting a temporary tower could be dispensed with, but in addition the detrimental effect of rough and inaccessible terrain to a proposed relay station location could be discounted and expensive access road construction for test purposes would not be necessary. Greater speed in path-loss testing with helicopters was also expected. What made plaintiff a logical entity to become involved in such a project was work which it had done, and in which it had expertise, in manufacturing fire control systems for bombers. That is, plaintiff had done substantial work with radar control of tail-mounted cannon in a bomber, in which the cannon was interconnected by a servo mechanism to a radar sensing device which served to direct the cannon at a target sensed by the radar. Plaintiff's idea was to substitute an antenna for the cannon and then mount the interconnected radar and antenna in a helicopter. A pair of helicopters would be employed, so fitted out, one to serve as the transmit, and the other, the receive, vehicle. When the helicopters were in the air, lock-on of facing radars would be achieved, which would automatically cause the microwave signal antennas to face each other. The tether for each helicopter would provide a means for fixing the height of a helicopter at such increments as might be desired. With this scheme, it was felt that path-loss testing could

be conducted with helicopters as effectively as with temporary towers.

The genesis of the project began with a Canadian firm, Co-ordinated Electronic Services Ltd. of Montreal, Canada, in which H. J. Ebbs-Canavan was a principal. This firm under date October 25, 1965 proposed a system to defendant for the use of helicopters in path testing. On its own Co-ordinated was unsuccessful in interesting defendant in becoming involved in such a product, and so Ebbs-Canavan contracted Robert C. Schulz of Avco who was a friend, for the purpose of involving Avco in the project. It was Ebbs-Canavan's idea that Avco was a logical entity for involvement because it had extensive experience in the building of bomber fire control systems. Schulz assigned Richard Chandler of his staff to investigate the project, and Chandler did so. When Chandler reported affirmatively to Schulz, Schulz asked Chandler to prepare a proposal for submission to defendant.

Under date May 24, 1966 plaintiff made a written proposal for the use of helicopters in path-loss testing to defendant, and on that date made an oral presentation to defendant at its 195 Broadway headquarters in New York City. On October 10, 1966 plaintiff submitted a second proposal to defendant, which the parties agree was a document upon which defendant relied in entering into the April 24, 1967 contract. The October 10, 1966 proposal provided that plaintiff would for $200,000, assemble the helicopters and hardware, which plaintiff would provide, and radio equipment to be furnished by defendant, and "demonstrate for AT&T a new method of conducting path-loss testing." After the submission of plaintiff's proposal, it was favorably received by defendant. Counsel for defendant then prepared the contract of April 24, 1967 here in question which was entered into between the parties on that date. This contract is, of course, of prime importance in this litigation, and its provisions will be discussed in some detail hereafter. We mention here that among other provisions it was provided that plaintiff was to test ten paths.

Plaintiff then proceeded to perform. Schulz was in general charge for plaintiff, and Chandler was, in effect, the active head of the project for plaintiff. Plaintiff acquired the necessary A–5 fire control systems and arranged for helicopter rental. One of its engineers, John R. Connelly designed the structures to be mounted within transmit and receive helicopters which would carry the radar and interconnected microwave antenna, and such structures were built by plaintiff. At the beginning of October 1967 a first helicopter was delivered to plaintiff by its helicopter subcontractor, Petroleum Airways. This helicopter was fitted out not only with the mentioned structure carrying the radar and microwave antenna, but also with appropriate microwave signal equipment supplied by defendant, consisting of a Polarad signal generator and a Hewlett-Packard travelling wave amplifier. The second helicopter was received by plaintiff the next month and that was also fitted out with a radar and microwave antenna structure, and microwave signal equipment supplied by defendant, in this case a Polarad receiver having attenuator dials and a meter by means of which the strength of received microwave signals was measured. Plaintiff then during December 1967 proceeded to field test the two helicopters in the area between Cincinnati and Dayton, Ohio. Several paths of varying lengths were selected, the longest being 18 miles.

Defendant had personnel on the scene who closely observed and worked with plaintiff in these field tests. Defendant's employee, Howard J. Drackley would receive the data from the receive helicopter by radio communication and record it. Working with Drackley was Willis N. Elliott, a Barnard employee, whose services were retained for this project by defendant. Riding in the re-

ceive helicopter was Marc Sutton, an employee of plaintiff who made readings at the appropriate times from the meter on the receiver, and it was these readings which were the end result of plaintiff's end of the project. It is of interest to note that it was plaintiff's employee who was making the readings rather than that of defendant. The reason for this was that the supervisor of the project for defendant had ruled that defendant's employees would not expose themselves to the risks of riding in either helicopter. As we have observed, both Drackley and Elliott were responsible to defendant, were present on the scene, and closely observed the proceedings. They were in daily contact with their superior Frank Finney, defendant's employee in charge of path-loss testing in the field in the Central Area. Finney on occasion himself came to Ohio to observe the proceedings.

At the end of 1967, plaintiff was satisfied with its equipment and moved everything, helicopters and all, to Illinois where the ten paths to be tested pursuant to the contract were located. The first path originated at Onarga, Illinois, and the receive position was at East Lynn, Illinois. While reluctant to do so for fear of derailing our chronological account, we will at this point mention that in September 1967 defendant had by conventional temporary tower test means pretested the Onarga-East Lynn path, with the clear intention of using the results thereof as a check for the helicopter testing which would occur there. Returning now to our chronological account, weather conditions did not permit the commencement of testing until January 9, 1968. On that day seven test runs were made, two A runs; three B runs; and two C runs. Finney was on the scene as were Drackley and Elliott, who foregathered that evening together with plaintiff's Chandler, and evaluated the assembled data of that day.

Because of intervening problems with equipment and weather, the next day when testing could occur was January 19, 1968, when five further runs were made, one A run, two B runs and two C runs. The proceedings that day were observed by several radio engineers, a title of some importance in defendant's hierarchy. On that day, for the first time, one of defendant's people, Mr. Ramey, a radio engineer, rode with Mr. Sutton in the helicopter. He observed that the needle on the meter was swinging badly. This occurred after the radio engineers on that day, January 19, 1968, had requested that the receive helicopter be brought to the ground near East Lynn while the transmit helicopter was in the air at Onarga. At that time they observed serious swings of the meter needle which they felt indicated that the system was not operating satisfactorily. Mr. Ramey's observations while riding in the helicopter showed needle swings not significantly better.

The next day when it was felt that testing could be conducted was January 24, 1968. On that day, Elliott rode with Sutton in the receive helicopter. He reported to Finney on the ground that large swings were occurring in the needle. At that point, Finney told Chandler that the system was not working satisfactorily and advised his superiors that useful test results were not being derived. Chandler was also informed of this fact. Testing was discontinued that day, January 24, 1968. The parties then arranged to hold a meeting in Chicago on January 26, 1968. At that meeting, by mutual consent further testing was discontinued. Promptly after that meeting, plaintiff returned the helicopters to its plant in Cincinnati where the installed equipment was removed, and the helicopters were returned to their lessor in order to avoid further costly charges. Defendant's personnel then also left the field. Notwithstanding the clear evidence that an outcome of the January 26, 1968 meeting is embodied in the language to be found in Joint Exhibit 102, Mr. Meehan's memorandum of that meeting,

that "agree to discontinue trial by mutual consent and work out contract settlement later," the parties found themselves unable to work out such a settlement. Following the January 26, 1968 meeting there were contracts with Carey of defendant initiated by Schulz of plaintiff asserting that plaintiff was entitled to payment for its performance and suggesting that the parties reach a settlement of the matter. While defendant's people met with plaintiff's representatives, it was to no avail, for defendant steadfastedly denied all liability. In about November 1968 the matter moved into the hands of attorneys for the respective parties, but the same attitudes continued. On October 17, 1969 the present suit was filed.

The foregoing should be understood to constitute findings of fact and is intended as an overview to set the stage for our discussion and recommendation. Further facts will be found hereafter in connection with that discussion.

## DISCUSSION

A. The Original Contract.

Plaintiff's obligations of performance are set forth in the contract entered into between the parties April 24, 1967. The provisions of the contract proper largely deal with collateral obligations of Avco in its performance, including its obligation to provide appropriate insurance, compliance with applicable workmen's compensation law, and the like. What Avco was to do bearing on the real purpose of the contract was stated in the following provisions of the contract. The first paragraph provides:

"The Contractor shall perform the work specified in Exhibit 'A' attached to and made a part hereof."

The second paragraph of the contract provides:

"The Contractor shall furnish all labor, tools and supplies and provide all equipment and materials to complete said work, except such items of equipment and/or material as are specified in said Exhibit 'A' to be furnished by the Telephone Company."

Exhibit "A" provides that Avco was to do the following:

"The Contractor shall conduct path-loss tests on ten paths on the south end of the proposed Lee, Illinois-Guston, Kentucky, radio relay route.

"Such tests shall be performed by the use of two helicopters in accordance with Section II of the Contractor's 'Proposal for Airborne Path-Loss Testing', dated 10 October 1966, which is attached hereto and made a part hereof.

"The Contractor shall provide the following:

"2 Bell 204B helicopters.

"An operator's console installed in each helicopter.

"Installation of Telephone Company equipment in each helicopter as appropriate.

"2 complete auto-tracking systems mounted in conjunction with the Telephone Company provided test antennas.

"2 winches suited to necessary tether requirements.

"2 helicopter crews consisting of one pilot and one mechanic/crewman each.

"1 supervising engineer.

"2 technician operators.

"All fuel, maintenance, operation, accommodation and support services required.

"The work of producing the required systems, consoles, and installation will commence immediately. Field tests will be completed and path-test results submitted to the Telephone Company within 210 days after contract is

signed. A list of site locations will be furnished to the Contractor within 30 days after request is made in writing to the Telephone Company."

Exhibit "A" of the contract also provides as to defendant's obligations of performance:

"The Telephone Company will provide and deliver to the Contractor at a mutually agreed upon point, two test transmitter-receiver sets, associated recording meters and antennas. The Telephone Company will provide adequate field liasion (sic) and a liasion (sic) engineer who will instruct the Contractor's personnel in the operation of the test equipment and in the Telephone Company propagation loss measurement method. All above equipment shall be returned in the same condition to the Telephone Company at a mutually agreed upon point upon completion of the work of this contract."

While the defendant Telephone Company provided the stated equipment and instructed Avco's personnel in the operation of the test equipment, it is a fact that defendant did not instruct plaintiff's personnel in its propagation loss measurement method, that is, the interpretation of data derived by operating the equipment. Instead, in carrying out the work under the contract, defendant's personnel did such interpretation. Plaintiff acquiesced in this deviation from Exhibit "A", for there is no evidence that plaintiff objected to it or requested a different procedure.

Exhibit "A" itself incorporates a further attachment to the contract referred to in Exhibit "A" as "Section II of the Contractor's 'Proposal for Airborne Path-Loss Testing', dated 10 October 1966." (The "Section II" attachment was actually a photocopy of a portion of the October 10, 1966 Proposal.) The relevant provisions of such attachment Section II are as follows:

"SYSTEM SPECIFICATIONS

"Helicopter Position Accuracy

"Elevation = 6 inches over site center

"Site Location—within 25-foot radi-"us circle over site center

"Maximum elevation—500 feet

"Communication Test Antenna Position

"Alignment to within 5 milliradians of major lobe of test antenna to test signal path.

"PROPOSED SYSTEM

"The proposed system utilizes two Bell 204B helicopters, such as shown in Figure 1. One of these mounts the microwave path-loss test transmitter and antenna, and the other the receiver, antenna and signal recording equipment. The radio antennas are stabilized in all axes by a radar lock-on tracking system mounted in each aircraft and mechanically aligned with the test antennas, to meet the following specifications.

"The main two elements of concern are first antenna positioning accuracy relative to test signal path—i. e. the test antenna reflecting surface must be essentially at right angles to the direction of the test signal = $\frac{1}{4}°$ in both horizontal and vertical planes, and second altitude control and aircraft position relative to site reference.

"Antenna Positioning Accuracy

"The order of accuracy required for positioning of the test antenna calls for a system analogous to that used for airborne gun laying equipment. One using a conical scan radar system would provide tracking to the accuracy required (About 1 order of magnitude better than the tolerance specified).

"Design accuracy of these systems is in the order of 2 milliradians."

B. The Extent of Avco's Performance of the Contract.

We find as a fact that Avco provided all of the listed items appearing in Ex-

hibit "A" beginning with "2 Bell 204B helicopters." We find further as a fact that, while there was deviation by plaintiff from the time schedule contained in Exhibit "A" (field tests to be completed and path-test results submitted to the Telephone Company within 210 days after contract is signed), the Telephone Company acquiesced in and consented to such deviation.

With regard to the specifications of the Section II attachment to the contract, we find as a fact (because defendant has admitted it in answers to interrogatories) that the specifications regarding helicopter positioning and hovering characteristics (hovering within 25-foot radius over site center and positioning plus or minus 6 inches over site center for a given elevation) were met.

Finally, we reach the question of whether plaintiff's performance was in accordance with the specification for antenna positioning accuracy, the premier matter of serious dispute between the parties. We find as a fact that it was. It is a point of some difficulty, for, as defendant's evidence established, there was no means for direct measurement of antenna positioning accuracy. Yet it is also true that defendant, which prepared the contract between the parties, did not therein require any means for direct measurement. Necessarily, then, proof on this point must be circumstantial. In reaching our conclusion on this point, we find not only that the parties intended that such specification be met, but we find further that it was the intention of the parties to rely upon the inherent design accuracy of the A-5 firing system to meet this specification. Thus, in plaintiff's October 10, 1966 Proposal, upon which defendant relied, plaintiff was advised that the "Design accuracy of these systems [i. e. one using a conical scan radar system] is in the order of 2 milliradians." Plaintiff thus notified defendant that in its testing it would be relying upon the design

accuracy of the system to comply with the antenna positioning specification. Defendant, by not providing for any extrinsic means of verifying such accuracy in the contract, which it prepared, signified that it agreed to this procedure.

At the trial, then, plaintiff offered evidence, which we accept, that the design accuracy of the A-5 firing system employed was of the accuracy which it had represented in its proposal. Plaintiff's evidence on this point is to be found in the testimony of Robert G. Smith, a program engineer for Cincinnati Electronics Corp., formerly Avco Electronics Division. Smith was an expert who had worked intimately with the Avco A-5 fire control system. He testified, insofar as here material, that Avco had produced about 1200 A-5 fire control systems, a fire control system consisting of a radar, a computer, a servo-system to drive a gun turret, and a weapon. He testified that every A-5 system was tested before it left Avco's plant, and was required to have an accuracy in aligning antenna to gun line of $\pm$ 3 milliradians which is equivalent to $\pm$ .17°. The gist of this testimony is that all the some 1200 A-5 fire control systems delivered by Avco at the time of delivery had an inherent capability of maintaining, by its radar, the angular orientation of the guns controlled by the radar to within $\pm$ .17°, actually less than the maximum allowed by the contract specification. Smith also offered his opinion after examining the structure here in issue, that no change had been made in the system which "would make it different from the A-5 fire control system with respect to its ability to align on a target."

In addition, John R. Connelly, plaintiff's mechanical engineer, who designed and supervised the building of the modified A-5 installation, testified that in his opinion that none of the changes he made in the A-5 fire control system affected the tracking accuracy of the modified system.

While the testimony of Dr. Levis cannot be relied upon as primary evidence that plaintiff in its work met the antenna positioning accuracy specification, it is suitable for corroborative evidence that such specification was met. That is, Dr. Levis found himself unable to testify affirmatively that plaintiff had met the specification. He did testify, however, that plaintiff's results were "consistent" with having met that specification.

In reaching the above conclusion, we considered the contention of defendant that it had affirmatively established that plaintiff had failed to meet the antenna positioning accuracy specification, but we find that we cannot accept defendant's argument in this regard. We find it necessary to analyze defendant's case on this point in some detail, for it is of significance in more than one respect in this case. The explication of defendant's contention begins with the undisputed fact that the needle swings on the attenuator meter, as observed by Elliott on January 24, 1968, were of the magnitude of 1.5 db. Defendant asserts that this meant that the agreement was not met. In making out its position, defendant does not say that there is a tolerance stated in the contract for acceptable needle fluctuations in measuring received signal strength, and, indeed, there is nothing in the contract about this. But in order to sustain its position, defendant points to and relies upon the specification for "antenna positioning accuracy relative to test signal path," on this score the specifications of the contract providing that "the test antenna reflecting surface must be essentially at right angles to the direction of the test signal plus or minus one-quarter degree in both the horizontal and vertical planes." Defendant offered evidence that misalignment of test antennas by plus or minus one-quarter degree would result in a needle fluctuation on the meter at the time of measuring received signal

strength of only ± .1 to .2 db. Since the fluctuation of the needle upon measuring received signal strength was 1.5 db, exceeding .1 to .2 db, says defendant, it logically follows that the positioning accuracy of test antennas was not within the contract specification.

Plaintiff takes issue with this position, and we agree, for defendant's contention is unsound. It would be sound only if antenna positioning accuracy were the only thing which affected the meter needle upon reading the meter to determine received signal strength. But this is not so. There was evidence at the trial as to the effect of scintillations on the meter needle when received signal strength was being measured. While opposing experts gave different views as to the magnitude of the effect of scintillations on reading the meter to measure received signal strength, it is fairly deducible from the testimony of defendant's expert that scintillations can account for a departure from actual received signal strength of as much as .6 db. Helicopter vibration and inherent effects from the radio equipment employed, are other possible causes of meter needle fluctuation which can affect received signal strength readings. There being no equivalence between the contract specification for test antenna positioning accuracy and extent of needle swing (measured in decibels) at time of reading strength of received signal, defendant's thesis breaks down, and we conclude that defendant has not proved that plaintiff failed to meet the specification for antenna positioning accuracy.

We have above detailed what plaintiff did in performing work under the contract. We conclude that plaintiff did everything required of it with one exception: it did not test the ten paths called for in Exhibit "A" of the contract.

C. The Ten Paths.

It is therefore necessary next to pay attention to why plaintiff did not test all

ten paths, and the related fact questions of why work was stopped when it was, and what the parties did when work was stopped, in order to answer the question of whether the failure to test all the ten paths called for by the contract bars plaintiff from any recovery. On January 24, 1968 plaintiff was advised by defendant that it was dissatisfied with plaintiff's test results because defendant believed that needle swings observed by Elliott on the signal receiver meter were too great for useful results for defendant's purposes. This led to a suspension of work and a meeting between the parties in Chicago on January 26, 1968. The outcome of that meeting was recorded by defendant's Meehan in a memorandum, JX–102, in the words: "Agree to discontinue trial by mutual consent and work out contract settlement later." Then and only then, did the project end. We mean for importance to be attached to this statement, for plaintiff contends that the project ended when defendant expressed dissatisfaction with plaintiff's work on January 24, 1968. We grant that had the project ended on January 24, 1968 because of an unjustified reason by defendant, as contended by plaintiff, this might have amounted to a breach of contract by defendant and different consequences than we hereafter find would have ensued. But that is not how it happened and we find no basis upon which we could conclude that defendant breached the contract when it notified plaintiff of dissatisfaction. See 4 *Corbin on Contracts* 905; *Builders Supply & Fuel Co. v. Huntington & Fink Co.*, 1 Ohio Law Abst. 251 (Cuyahoga, 1922); *Gilmore v. American Gas Machine Co.*, Ohio Com.Pl., 129 N.E.2d 93, 70 Ohio Law Abst. 569 (C.P. Franklin, 1952). Let us review what did happen.

What is pertinent is what happened in the course of testing in Illinois in January 1968. The first day of testing was January 9, 1968. Sutton rode in the helicopter and read the signal receiver meter; Drackley and Elliott were on the ground receiving Sutton's data via radio and recording it. Sutton made readings when radar was locked on, and he would know this when he saw a blip on the radar screen and a red light came on.

There is no indication that there was any dissatisfaction on the part of defendant with plaintiff's results obtained January 9, 1968. Indeed, after the results were reviewed by Finney, Finney indicated that they could move on to the next path if they could get another day like that. Finney reached this conclusion after comparing the results to those derived from temporary tower testing on that path.

The next day of significance was January 19, 1968, the next suitable day for testing. On that day four of defendant's radio engineers came to the site to observe. One of them was a Mr. Ramey. The engineers requested that the equipment in the receive helicopter be operated on the ground. When this was done, it was observed that the needle on the meter was swinging over a range of some 8 db. Ramey then rode in the receive helicopter with Sutton on that day, and concluded from his observations that the extent of meter fluctuations was not acceptable. Based on this information, Finney told Chandler that the system was not acceptable.

Yet work continued. The next day testing was attempted was January 24, 1968, though no data was recorded that day. It was on that day that Finney sent Elliott up in the receive helicopter with Sutton. Sutton reported that needle "fluctuations of 1.5db were still present." Finney discussed this with Chandler by phone; told Chandler that the "data wouldn't do us any good" and "suggested that we have our higher management people discuss what our next move should be."

Chandler then testified that he agreed with the statements made in JX–102 as to what happened at the January 26, 1968 meeting. Bottani testified that at

the meeting it was mutually agreed to cease operations. Meehan testified on deposition that JX–102 accurately reflects what was said by the parties at the January 26, 1968 meeting. Carey's testimony on deposition (Carey was supervisor of engineering for the Central Area and was Meehan's superior) was that the contract was not in existence by May 1968, but "that we all agreed to cease and desist back in about February."

It is our conclusion, and we find as a fact, that prior to the January 26, 1968 meeting, there was no act by either party which was of legal consequence. Only on January 26 did such an event occur, when the parties mutually agreed to cease operations "and work out contract settlement later." This conclusion is of some consequence in this litigation for it means that there is no basis for the contention by plaintiff that defendant terminated the agreement so as to bring paragraph 9 of the contract into operation, nor was there a breach or repudiation of the contract by either party, anticipatory or otherwise. Beginning January 19, 1968 and up to January 24, 1968, defendant was only saying that plaintiff's performance was unacceptable. There was no expression of unwillingness to continue cooperating with plaintiff in further performance of the contract. Indeed, there is no reason to believe that a basis for further cooperative performance might not have emerged from the January 26, 1968 meeting.

We conclude that the project was terminated when the parties entered into a contract on January 26, 1968 modifying the original contract of April 24, 1967. The modifying contract was supported by consideration. The events which happened immediately after the January 26, 1968 meeting tell us what the consideration was. Both parties had personnel in the field and were incurring operational expenses. Both parties withdrew their personnel, and plaintiff immediately took steps to return its rented helicopters to the lessor. Thus, there was consideration in that both parties were relieved of incurring further expenses in performing under the original contract.

Instead of making the agreement which they did on January 26, 1968, each party had open to it a different course, and gave up its right to that alternative position when it entered the January 26, 1968 agreement. Thus, defendant could have said we have no responsibility under our contract, for you have failed to perform it. We are simply going to withdraw from further efforts. We owe you nothing. Plaintiff could have said, we *are* performing under the contract; we insist that you participate with us in concluding the remaining nine paths, and if you do not, we will sue you for breach of contract. Each party gave up its right to that respective alternative position when it entered the January 26, 1968 agreement to "discontinue trial by mutual consent and work out contract settlement later." Defendant by so agreeing relinquished the position that it was entitled to have plaintiff fully perform all of its obligations under the contract including the remaining nine paths. It also was recognizing some liability when it agreed to "work out contract settlement later." Plaintiff for its part relinquished its right to insist that it was entitled to complete the remaining nine paths and thereby secure the full contract payment.

To answer the question with which we began this section, we conclude that, by entering into the modifying contract on January 26, 1968, defendant excused plaintiff from further performance under the original contract, and specifically what this meant was that plaintiff was excused from performing tests on the remaining nine paths called for by the contract.

In sum, then, we reach the conclusion that plaintiff had rendered part performance under the contract in accordance with the terms of the contract, and plain-

tiff was excused by defendant from completing its work under the contract. Plaintiff is therefore entitled to compensation under the contract for the work which it did.

**D. Plaintiff's Alternative Positions for Recovery.**

While we have found plaintiff entitled to recover in accordance with our foregoing discussion, we reject plaintiff's alternative theories of recovery. For a complete disposition of this case some discussion of such alternative theories is required.

Plaintiff's first thesis is that when Finney notified Chandler on January 24, 1968 that Avco's work was unacceptable, this in and of itself worked a "termination" of the contract within the meaning of paragraph 9 thereof, and therefore plaintiff is entitled to compensation in accordance with the provisions of that paragraph. Paragraph 9 provides:

"If the Telephone Company shall, during the course of the work determine that the work being performed hereunder will not meet its requirements for path-loss data, the Telephone Company may terminate the work. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination, specifying the extent to which the performance of the work under the contract is terminated, and the date upon which such termination shall be effective.

"After receipt of a Notice of Termination the Contractor shall stop work, and shall submit promptly a termination claim. The amount to be paid the Contractor shall be based upon the costs incurred plus a reasonable amount for profit, less any amounts already paid to the Contractor. In the event of termination, the Contractor shall make its books and records available to the Telephone Company."

True it is that the Telephone Company determined that the "work being performed hereunder will not meet its re-

quirements," but the Telephone Company did not "terminate the work" within the meaning of this paragraph. The short and plain answer to plaintiff's contention in this respect is that the work was not terminated by defendant's unilateral action on January 24, 1968, but by the bilateral action, the mutual agreement of the parties, on January 26, 1968.

We find as a fact that the reason paragraph 9 was in the contract, as testified by defendant's counsel John S. Van de Motter who drafted paragraph 9, was to provide defendant with a means, should it so desire, to terminate performance unilaterally. He testified:

". . . the thing to be accomplished by a termination provision is that if for whatever reason you had no need for what was being produced . . . and you had a contract and you wanted to cut it off with a lesser number, you would then have the right to do that."

Had the work ended because of defendant's unilateral action, there might be room for plaintiff's argument that the word "may" should be interpreted "must", in support of which plaintiff cites *Lane v. Allen*, 307 F.Supp. 881 (N. D.Ohio 1969); *Bloom v. Texas Board*, 475 S.W.2d 374 (Tex.Civ.App.1972); *Noble v. City of Warsaw*, 297 N.E.2d 916 (Ind.App.1973); *U. S. v. Lennox Metal Mfg. Co.*, 225 F.2d 302 (2nd Cir. 1955); *Wright v. Erie R. Co.*, 14 Ohio App. 217 (C. A. Portage Co. 1921), but that is simply not the case.

Plaintiff's second thesis is that it is entitled to succeed on a theory of anticipatory breach. No more need be said on this score than what we have already said, that there was no anticipatory breach, for work stopped because of the mutual agreement of the parties, not because defendant notified plaintiff it was dissatisfied with the work. Cases such as plaintiff's *Dieterle v. Gatton*, 366 F. 2d 386 (6th Cir. 1966) are readily distinguishable. In *Dieterle* the facts were that plaintiff was held entitled to re-

cover for the work which he had done to secure a bank charter for defendant, though the charter was not secured, when all that remained to be done to secure issuance were acts by defendants themselves who failed to perform them. That is not just analogous to the situation here, for plaintiff's full performance was not prevented by any inaction by defendant but came about because of the mutual agreement of the parties.

In its third thesis, plaintiff contends that it is entitled to recover the payment provided under the contract, $200,000, because defendant breached its duty of performance under the contract. Count III was amended in the course of the trial when we granted plaintiff's motion under Rule 15(b) of the Federal Rules of Civil Procedure to amend the second amended complaint to conform to the evidence. By such amendment, plaintiff, in paragraph 16, stated its essential allegation:

> "As early as January 9, 1968, Telephone Company failed to provide adequate field liaison in that it failed to utilize that degree of skill in the analysis of the data as required under all the circumstances known to it. Avco was not aware of the details of nor was it a party to such analysis, and it relied upon the information furnished it by Telephone Company regarding the analysis of such data."

Plaintiff concludes Count III, saying that by reason of this conduct defendant breached its obligations to plaintiff and prevented plaintiff from performing its work pursuant to the contract.

We may summarize plaintiff's position in this regard, that plaintiff must establish two points: (1) that defendant had a duty under the contract to analyze the data derived by plaintiff in its testing, and (2) defendant breached that duty by failing to perform it with requisite skill.

In support of its proposition as to the existence of the duty, plaintiff relies upon the provision in the contract that defendant is to provide "adequate field liaison" in Exhibit "A" of the contract, last paragraph. Plaintiff refers to evidence at the trial supportive of its position, where Finney testified that there was no question in his mind that it was the responsibility of defendant to analyze the data produced by the use of helicopters. And Harry Morrison, Jr., an executive of defendant, testified that defendant was "not asking Avco to analyze any data for us." Further, plaintiff calls our attention to a memorandum by Bottani, executive of defendant in charge of the project, in discussing the statement of the obligations of defendant as set out in the Exhibit "A" language above (JX-45):

> "The main function of the field liaison will be to receive the path-test data as the various runs are completed and assist in the interpretation in order to determine the desirability and feasibility of this method of path-testing."

We couple with this evidence the testimony by Chandler that plaintiff simply did not have the capability of analyzing test results. Plaintiff's position as to the second point which it must prove to be entitled to recovery under the present theory, is that Finney and Drackley, the only two persons who analyzed the helicopter data during the tests, were not capable of and did not perform an adequate analysis. Plaintiff contends that defendant knew or should have known that a more sophisticated analysis was required.

Defendant limits its opposition to this third thesis to a contention that plaintiff is attempting to read words into the contract which are not there, thus changing the obligations of the parties, and says that the contract simply does not impose a duty upon defendant of furnishing Avco with "proper" analysis of data.

We think that there can be no doubt, and we find as facts, that in their performance of the contract, the parties considered it not to be a part of plain-

552

tiff's obligations of performance under the contract to analyze the data which was derived upon testing, and that this work was carried out by defendant's personnel. But whether defendant did this well or badly is not relevant to liability.

Plaintiff cannot succeed on this theory, for the reason that we fail to find an affirmative duty owing by defendant to plaintiff of analysis of data; all that we are willing to conclude is that plaintiff did not have the obligation of interpreting test data, and these are quite different things. The absence of any obligation on plaintiff to analyze the data provides it with a shield, but no sword.

Moreover, as stated in our earlier analysis of the facts, it was because, beginning January 19, 1968, defendant came to believe that unacceptable needle fluctuations were present, that defendant advised plaintiff that its work was unacceptable, and this had nothing whatever to do with analysis of data. The whole area of conflict regarding what defendant did in analyzing data obtained by plaintiff, which took a considerable part of the trial, is therefore entirely beside the point. This conflict had to do with whether or not the data derived by plaintiff on helicopter testing was comparable to that earlier derived by temporary tower testing on the Onarga-East Lynn path. This conflict arose after the fact, for as events unfolded during January 1968, such comparability of data was not a matter of controversy between the parties. Lack of comparability was not the reason the Telephone Company regarded plaintiff's work as unacceptable on January 19 and January 24, 1968.

Furthermore, in denying relief to plaintiff on this third thesis, we disagree that defendant failed to utilize the required degree of skill in its analysis of data. In this regard, as well as in the balance of what was required of defendant in its performance, it is good faith which is the standard, and we find as a fact that defendant's conduct comport-

ed with good faith. It assigned to this project, and relied upon the efforts of, Frank Finney. It was reasonable for defendant to assign Finney to this project and he was well qualified to serve. He had been employed as defendant's supervisor in transmission engineering for an extended period of time, with responsibility for orientation and testing of all antenna systems in the Central Area. He had had substantial prior experience in path-loss testing. While plaintiff developed the fact that his formal education had not taken him to college, he was well qualified by his work in the field to perform his assignment. His superiors regarded him as very competent and we find this characterization entirely justified.

None of the cases cited by plaintiff in connection with its third thesis of recovery compels a conclusion favorable to plaintiff. Thus, *Helene Curtis Industries, Inc. v. United States*, 312 F.2d 774, 160 Ct.Cl. 437 (1963) was a case in which defendant had put out specifications for bid for the manufacture of kits of a novel disinfectant powder and plaintiff was the successful bidder. The suit involved a claim by plaintiff for extra compensation over and above the bid price. Plaintiff was successful in securing judgment. The basis for plaintiff's success was that the court found that defendant knew of a need for grinding in the course of preparing the material under contract and failed to apprise bidders of this. It was held that the Government had an affirmative obligation of advising its bidders that grinding was required and could not remain silent. The *Helene Curtis* case is distinguishable on its facts, and indeed is inapplicable here, because regarding analysis of data, there was no information known to defendant which was unjustifiably withheld from plaintiff. Indeed, there was no need for plaintiff, in performing its obligations under the contract, to receive information from defendant about analysis of data.

*Strand v. Librascope, Inc.*, 197 F.Supp. 743 (D.C.Mich.1961) was a case where plaintiff sued for breach of warranty and fraud regarding components which it had purchased from defendant for an electronic digital computer. This case is distinguishable because it relates to the duty of a seller of goods. That is not the role of defendant in our case. A seller of goods owes a duty to his purchaser that the goods which it provides be fit for use. Defendant in our case, so far as analysis of data was concerned, had no obligation to provide that to plaintiff, and its position was not comparable to that of a seller of goods. The same remarks apply to *Cincinnati Gas & Electric Co. v. Westinghouse*, 465 F.2d 1064 (6th Cir. 1972) where plaintiff purchased a valve for an electric generating unit from defendant, and in connection with such sale the court found that an express warranty of proper supervision of installation existed. And the same remarks are applicable with regard to *Strickland v. Perruccio*, 5 Conn.Cir. 142, 246 A.2d 810 (1968) where defendant, under contract, installed a septic tank for plaintiff and plaintiff sought to recover damages because of claimed improper installation.

Summarizing, plaintiff's authorities are not applicable because our fact situation is entirely different from that in those cases, in that here, defendant owed no duty under the contract to provide plaintiff with interpretations of data derived by plaintiff upon plaintiff's testing.

Plaintiff finally urges a fourth thesis which is susceptible either of the interpretation that (1) all that was required of plaintiff within the contemplation of the parties was that plaintiff determine the feasibility of the use of helicopters in path-loss testing, or (2) the only reason that the system turned out not to be feasible was because of defects in the equipment supplied by defendant to plaintiff for use in the testing, plaintiff here referring to the microwave equipment supplied by defendant in accordance with the contract, and more specifically, to the adequacy of the Polarad receiver.

Upon our consideration of the evidence, we find it to be a fact that it was not simply feasibility that defendant was interested in; it also wished, and contracted for, the testing of ten paths. In this respect the original contract between the parties was clear and unambiguous, and where this is so, the parties are governed by the express language of the contract. *Blosser v. Enderlin*, 113 Ohio St. 121, 148 N.E. 393 (1925); *Tillotson & W. Co. v. Scottdale Machine & Mfg. Co.*, 23 Ohio App. 399, 155 N.E. 409 (Cuyahoga Co. 1926); *Cohen-Hall-Marx Co. v. Vanosdall*, 25 Ohio App. 360, 157 N.E. 908 (Ashland Co. 1927).

In support of its proposition that it is entitled to recover because all that was contemplated was a feasibility study, plaintiff cites *Coto-Matic, Inc. v. Home Indemnity Co.*, 354 F.2d 720 (10th Cir. 1966). That case gives plaintiff no help, for what was involved there was construction of the ambiguous word "continuous". The decision of the court was in favor of the fabricator upon its conclusion that the obligation for "continuous" operation of the machine had, as a matter of fact, been met. As to plaintiff's contract obligation here to test ten paths, there was no comparable ambiguity.

With respect to the contention of plaintiff that the Polarad receiver supplied by defendant was defective, and, that thereby the defendant breached an implied warranty of fitness for use of such equipment, we disagree with the position of plaintiff. While it is true that in its temporary tower testing, the standard equipment employed by defendant was a Western Electric TE receiver, there was neither negligence nor bad faith on the part of defendant in furnishing a Polarad receiver for helicopter testing. The Polarad receiver was transistorized and therefore lighter than the

TE receiver, and for this reason was preferable for helicopter testing. A Polarad receiver had been satisfactorily used in path-loss testing in the Eastern Area. We find as a fact that defendant had no reason to believe that the Polarad receiver would not function adequately in the testing carried out under the present contract. We find further as a fact that the Polarad receiver did function adequately. While there was evidence of drift in its use, we find as a fact that this did not interfere with plaintiff's program, and the drift was readily compensated for by those who analyzed the data derived through its use. Any negative connotation on defendant's part for supplying this equipment is laid to rest by the evidence which shows that when problems developed through use of the Polarad receiver, defendant offered to replace it with a TE receiver and plaintiff refused the substitution.

We distinguish plaintiff's *Ekco Products Company v. United States,* 312 F.2d 768, 160 Ct.Cl. 75 (1963) case, a case where plaintiff was found entitled to recover damages when defendant had provided the machines to do the job, but the machines had performed badly, because in the case before us, the Polarad receiver was as a matter of fact adequate.

## MEASURE OF DAMAGES

In the circumstances of this case we find that plaintiff is entitled to recover the contract price less the cost to defendant of completing the work left undone at the time of termination. What was left to be done by defendant was the testing of nine paths. Plaintiff had performed tests on the first path

which were acceptable to defendant. Moreover, prior to the time that work on the project came to a close, defendant had already tested the first path by conventional means. After the January 26, 1968 agreement defendant did in fact test the remaining nine paths by conventional temporary tower means. The evidence was that defendant's cost for conventional testing was approximately $8,000 per path (Tr. 641), and defendant is therefore entitled to a credit of $72,000 against the contract price of $200,000. We therefore conclude that plaintiff is entitled to recover $128,000 of defendant.

We find authorization for such an award at 25 C.J.S. Damages § 75, p. 857, where the text states:

"The measure of plaintiff's recovery for partial performance, when he is entitled to recover . . . is the reasonable value of labor and materials furnished, having reference to the contract price, not to exceed the benefit received by defendant, and subject to a deduction of the amount of damages sustained by defendant by reason of plaintiff's failure fully to perform the contract."

In Ohio, such a rule has been applied in *Reinhard v. Bertram,* 101 Ohio App. 225, 1 O.O.2d 151, 136 N.E.2d 775 (Ct.App. Hamilton Co. 1956); *Dreher v. McKenzie,* 16 Ohio Cir.Ct.R., N.S., 55 (Ct.App. Cuyahoga Co. 1908); *Daniels v. Corey Co.,* 2 Ohio App.2d 297, 31 O.O.2d 460, 208 N.E.2d 150.

We recommend that plaintiff have judgment in the amount of $128,000 and its costs.

(s) Burton Perlman
United States Magistrate